# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| Crypto Infiniti, LLC, <br><br> Plaintiff, <br><br> v. <br><br> Blockquarry Corp. f/k/a ISW Holdings, Inc., and Pantheon Resources, Inc., <br><br> Defendants. | C/A No. _____ <br><br> **COMPLAINT** <br><br> *(Jury Trial Demanded)* |

The Plaintiff Crypto Infiniti, LLC ("CI" or "Plaintiff") complaining of the Defendants Blockquarry Corp. f/k/a ISW Holdings, Inc. ("Blockquarry") and Pantheon Resources, Inc. ("Pantheon") (collectively "Defendants") would respectfully allege and show as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Crypto Infiniti, LLC is a Nevada limited liability company with its principal place of business located in Reno, Nevada. No member of CI is a South Carolina resident or citizen.

2. Blockquarry is a Nevada corporation with its principal place of business located in Houston, Texas. Blockquarry is registered to do business in South Carolina.

3. Pantheon is a Delaware corporation with its principal place of business in Missouri.

4. Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2) because the most substantial part of the events giving rise to the claims made herein occurred in Cherokee County, South Carolina.

5. This Court has personal jurisdiction over Blockquarry and Pantheon because each defendant's conduct giving rise to the claims made herein occurred in South Carolina, and the claims relate to business activities that each defendant undertook in South Carolina.

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because all parties are diverse, none of the parties, or their members, are citizens and residents of South Carolina, and the amount in controversy exceeds $75,000.00.

## FACTS

7. The Plaintiff is in the business of mining for bitcoins which utilizes specialized and powerful bitcoin mining machine computers ("Miners"). For its business operations, Plaintiff is reliant on the sustained use of its Miners.

8. Defendant Blockquarry is a cryptocurrency mining development company that contracts for real estate, utility services, and housing for cryptocurrency mining servers.

9. Defendant Pantheon is a company which purports to secure and develop land for data processing centers related to the development of artificial intelligence.

10. To conduct its business, CI became aware of the Bit5ive group of companies, particularly Uptime Hosting, LLC, ("Uptime Hosting"), Uptime Armory LLC ("Uptime Armory"), Bit5ive LLC ("Bit5ive"), and Bit5ive International LLC.

11. CI entered into a Hosting and Security Agreement (the "Hosting Agreement") with Bit5ive to conduct hosting services for CI. Hosting services means that an entity or person locates a suitable location to place a bitcoin mining operation and operates and maintains Miners during their operation. Hosting services includes maintaining the Miners and maintaining the environment where the Miners are operating at a certain temperature.

12. CI and Bit5ive had clearly defined roles and responsibilities. A copy of the Hosting Agreement is attached as *Exhibit 1*.

13. Pursuant to CI's Hosting Agreement with Bit5ive, it initially deployed approximately 1,882 bitcoin miners to 150 Hyatt Street, Gaffney, South Carolina (the "Gaffney Site").

14. CI purchased Miners directly from a company known as Bitmain Technologies Limited and had those Miners shipped directly to the Gaffney Site. In addition, CI deployed Miners it already owned to other locations hosted by Bit5ive, and Bit5ive later shipped those Miners to the Gaffney Site.

15. Under the Hosting Agreement, CI supplied the Miners and agreed to pay Bit5ive the associated electricity and hosting fees. In return, Bit5ive was to provide electricity, space, and other services for the operation of the Miners.

16. On June 29, 2021, CI and Uptime Armory entered into a Sale and Purchase Agreement ("Container Agreement") under which CI agreed to purchase eight 40' standard shipping containers specifically designed for Miners (hereinafter "Mining Containers"). A copy of the Container Agreement is attached as *Exhibit 2*.

17. CI paid Uptime Armory pursuant to the Container Agreement and Uptime Armory delivered two Mining Containers to the Gaffney Site.

18. On May 21, 2022, CI and Bit5ive entered into Amendment #1 to the Hosting Agreement. A copy of Amendment #1 is attached as *Exhibit 3*.

19. Due to the Gaffney Site's power limitations and for repair work, CI caused Bit5ive to transfer approximately 1,316 of its Miners to a different hosting location. This resulted in CI retaining approximately 566 Miners and the two Mining Containers at the Gaffney Site.

20. CI upheld all of its obligations under the Hosting Agreements and Container Agreements.

21. CI timely paid all appropriate invoices and sent monies to Bit5ive, Uptime Armory, and even Uptime Hosting.

22. Bit5ive and Uptime Armory failed to meet their obligations to CI.

23. This resulted in the Gaffney Site becoming shut down and pad locked, which resulted in CI's Miners and Mining Containers being withheld from CI during a significant amount of time. During this "down time" the Miners were not able to be used for bitcoin mining. This down time resulted in financial damage to CI.

24. Defendant Blockquarry was engaged in a lawsuit against the owner of the Gaffney Site, the Gaffney Board of Public Works ("the Board"), and Litchain Corp. *Blockquarry Corp. v. Litchain Corp.*, No. 7:23-cv-01427 (D.S.C. Apr. 7, 2023) ("Litchain Litigation"). The Litchain Litigation caused CI's Miners and Mining Containers to be withheld from CI.

25. The Litchain Litigation concerned the lease and electricity bills at the Gaffney Site and the subsequent revocation of the lease. Throughout the Litchain Litigation, Blockquarry referred to itself as the "bailee" for the personal property at the Gaffney Site which, if true, would confer upon Blockquarry the obligation to deliver the personal property to the person entitled to the property under a document of title.

26. After CI became aware of the Litchain Litigation, CI and Bit5ive corresponded by email on April 14, 2023, regarding CI's Miners located at the Gaffney Site. A copy of the email correspondence between the two companies is attached as *Exhibit 4.*

27. The email correspondence that is *Exhibit 4* includes the statement from a Bit5ive employee that states that CI is the owner of two of the Mining Containers located at the Gaffney Site.

28. On May 8, 2023, CI corresponded with Blockquarry about its Personal Property. The email correspondence is attached as *Exhibit 5*. The correspondence makes clear that CI gave notice to Blockquarry, and Blockquarry's counsel, of CI's ownership of the Miners at the Gaffney Site.

29. CI sent an agent to the Gaffney Site in July 2023 to physically inspect the site and to confirm that it appeared consistent with the representations made by the litigants in the Litchain Litigation. At that time, the CI agent confirmed that the Gaffney Site was locked.

30. CI continued to keep in contact with Bit5ive, thereafter.

31. On November 2, 2023, Defendant Blockquarry and the Board filed a joint stipulation of dismissal with prejudice of all claims and crossclaims between them. However, Defendant Blockquarry's lawsuit against Litchain Corp. continued.

32. CI is a beneficiary of the settlement agreement between Blockquarry and the Board because, upon information and belief, the settlement agreement required Blockquarry to return all property from the Gaffney Site to its rightful owners.

33. CI and Bit5ive again corresponded by email on November 14, 2023, to confirm the serial numbers for CI's Miners located at the Gaffney Site. The individual from CI with whom Bit5ive corresponded is named Keze Li. Ms. Li works for CI. A copy of the email correspondence is attached as *Exhibit 6*.

34. The email that is *Exhibit 6* contains an excel spreadsheet. The excel spreadsheet lists Miners owned by CI. The spreadsheet also notes that the Miners are located in pods 10 and 11.

35. Pods 10 and 11 are the Mining Containers owned by CI.

36. The spreadsheet located at *Exhibits 5* and *6* are the same spreadsheets from the affidavit of Donnie L. Hardin, which was provided in the Litchain Litigation. Donnie L. Hardin is the General Manager of Gaffney Board of Public Works. The referenced affidavit is attached as *Exhibit 7*.

37. Specifically, the serial numbers identified on the spreadsheet regarding some of CI's Miners located at the Gaffney Site, *Exhibits 5* and *6*, match the spreadsheet that Mr. Hardin provided in his affidavit.

38. The only difference between these spreadsheets is that in the one provided in Mr. Hardin's affidavit, there is a notation in the top-right corner that says Blockquarry.

39. Upon information and belief, the spreadsheet in the Hardin Affidavit is the same spreadsheet that CI provided to Blockquarry in the May 8, 2023, email correspondence.

40. Upon information and belief, Blockquarry, or one of its agents, altered the spreadsheet that CI provided to Blockquarry by adding Blockquarry's name to it before sending the same to Mr. Hardin.

41. Blockquarry does not own the Miners referenced on the spreadsheets. Those Miners and the Mining Containers are owned by CI.

42. CI paid for these Miners and the Mining Containers.

43. Blockquarry did not pay for the Miners and Mining Containers referenced in the spreadsheets found at *Exhibits 5, 6,* and *7*.

44. Pantheon did not pay for the Miners and Mining Containers referenced in the spreadsheets found at *Exhibits 5, 6,* and *7*.

45. On January 12, 2024, Blockquarry made a filing in the Litchain Litigation. In that filing, Blockquarry stated, "[i]t is undisputed Blockquarry was permitted to reenter the Premises

[that is, the Gaffney Site], and, on or about November 17, [2023,] it removed the Bitcoin mining equipment with the authorization of the [Board]." In the filing, Blockquarry also suggested that the publicly-filed inventories of the Miners located at the Gaffney Site were incorrect.

46. The January 12, 2024, information found in the statements made by Blockquarry in the public filing were not known to CI prior to the public filings.

47. Thereafter, CI moved to intervene in the Litchain Litigation to retrieve possession of its Miners and Mining Containers. In the Litchain Litigation, CI filed documents showing that it placed its Miners and Mining Containers at the Gaffney Site and was the lawful owner of the same.

48. Upon information and belief, Pantheon is aware of CI's ownership of the Miners and Mining Containers and has acted in total disregard of this information.

49. Upon information and belief, Blockquarry has claimed, asserted, or alleged that it owns or has a superseding possessory interest in CI's Miners and Mining Containers.

50. CI does not owe Blockquarry any payment for outstanding debt obligations, or for anything else. CI paid substantial sums of money to fund the operations at the Gaffney Site pursuant to its Hosting Contract, and it paid substantial sums of money to purchase the Mining Containers.

51. CI does not owe Pantheon any payment for outstanding debt obligations, or for anything else. CI paid substantial sums of money to fund the operations at the Gaffney Site pursuant to its Hosting Contract, and it paid substantial sums of money to purchase the Mining Containers

52. Blockquarry does not own or have any interest in CI's Miners and Mining Containers.

53. Pantheon does not own or have any interest in CI's Miners and Mining Containers.

54. Upon information and belief, after Blockquarry secured the right to obtain all the bitcoin mining equipment from the Gaffney Site, Blockquarry selected Pantheon to conduct the removal.

55. Upon information and belief, Pantheon and its agents travelled to the Gaffney Site, retrieved the bitcoin mining equipment, and moved the same to a location in Missouri.

56. Pantheon and Blockquarry worked together to coordinate the removal of the bitcoin mining equipment from the Gaffney Site.

57. Pantheon and/or Blockquarry are presently holding CI's Miners and Mining Containers.

58. Neither Pantheon nor Blockquarry have a lawful right to possess CI's Miners and Mining Containers.

59. Pantheon is aware that Blockquarry did not own CI's Miners and Mining Containers.

60. Pantheon has refused to return Miners from other businesses who have made a demand upon Pantheon. Specifically, Pantheon has refused to return Miners to a company named BEEQB, LLC.

61. Each day that Pantheon and Blockquarry unlawfully possess CI's Miners and Mining Containers, CI is financially harmed because CI is unable to use the Miners to mine for bitcoins.

**FOR A FIRST CAUSE OF ACTION**
**(CONVERSION AS TO BOTH DEFENDANTS)**

62. Plaintiff incorporates verbatim the allegations in the preceding Paragraphs.

63. Blockquarry has wrongfully converted CI's Miners and Mining Containers for its own personal use.

64. Pantheon has wrongfully converted CI's Miners and Mining Containers for its own personal use.

65. Blockquarry should have returned CI's Miners and Mining Containers to it immediately after obtaining access to the same under the Settlement Agreement.

66. Instead, Blockquarry and Pantheon worked together to wrongfully take CI's Miners and Mining Equipment to Missouri.

67. Blockquarry and Pantheon's retention of the Miners and Mining Containers, and refusal to return the same, constitute an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to CI, resulting in CI being deprived of its assets as a direct and proximate result of Blockquarry and Pantheon's conduct.

68. Blockquarry and Pantheon's acts of conversion were willful, reckless, and/or committed with conscious indifference to the rights of CI.

69. As a result of Blockquarry and Pantheon's conversion, CI has suffered damages in an amount to be determined at trial.

70. An award of punitive damages should also be assessed against Blockquarry and Pantheon to impress upon each the seriousness of their misconduct.

71. CI is also entitled to an award of legal interest from the date when Blockquarry and Pantheon took possession of CI's Miners and Mining Containers.

72. CI is also entitled to an award of prejudgment interest because the damage flowing from the wrongful taking of CI's Miners and Mining Containers can be reduced to a sum certain.

## FOR A SECOND CAUSE OF ACTION
**(NEGLIGENCE AND GROSS NEGLIGENCE OF BAILEE: AS TO DEFENDANT BLOCKQUARRY)**

73.     Plaintiff incorporates verbatim the allegations in the preceding Paragraphs.

74.     In the Litchain Litigation, Blockquarry held itself out as bailee of the equipment locked down at the Gaffney Site.

75.     Blockquarry was, in fact, a bailee of that equipment in that it received delivery of the personal property of CI in trust for a specific purpose pursuant to an express or implied contract to fulfill that trust.

76.     Blockquarry therefore owed a duty of care to CI as the bailor.

77.     Blockquarry breached that duty by retaining possession of CI's Miners and Mining Containers.

78.     As a natural consequence and proximate result of Blockquarry's negligence, CI has suffered foreseeable damages including, but not limited to, the deprivation of its Miners and Mining Containers and the income expected from the operation of the same.

79.     Blockquarry's misconduct rose to the level of gross negligence, willful, and wanton misconduct.

80.     CI is entitled to the damages associated with Blockquarry's conduct, in an amount to be determined by a jury trial.

81.     An award of punitive damages should also be imposed against Blockquarry and in an amount sufficient to impress upon it the seriousness of its misconduct.

## FOR A THIRD CAUSE OF ACTION
**(BREACH OF CONTRACT AGAINST BLOCKQUARRY)**

82.     The Plaintiff incorporates verbatim the allegations in the preceding Paragraphs.

83. On or about November 2, 2023, Blockquarry and the Board entered into an agreement (the "Settlement Agreement") regarding claims in the Litchain Litigation.

84. The Settlement Agreement is a valid, binding contract supported by sufficient consideration among Blockquarry and the Board.

85. CI is a third-party beneficiary who may enforce the Settlement Agreement. Upon information and belief, the Settlement Agreement conferred a direct benefit upon CI by requiring Blockquarry to return the equipment locked down at the Gaffney Site to its rightful owners.

86. Blockquarry has breached the Settlement Agreement by not returning the equipment to CI.

87. As a direct and proximate result of Blockquarry's breach, CI has been injured and is entitled to any such relief the Court deems just and appropriate, including specific performance of the Settlement Agreement, and an award of attorney's fees and costs.

## FOR A FOURTH CAUSE OF ACTION
(UNJUST ENRICHMENT AS TO BOTH DEFENDANTS)

88. Plaintiff incorporates verbatim the allegations in the preceding Paragraphs.

89. Blockquarry and Pantheon do not own CI's Miners and Mining Containers.

90. Upon information and belief, Blockquarry and Pantheon have been using CI's Miners and Mining Containers to mine bitcoin.

91. Blockquarry and Pantheon have alleged that they would do this to a party similarly situated to CI, namely BEEQB, LLC. As a result, CI's belief that its Miners and Mining Containers are being used by Blockquarry and Pantheon is based on representations by them.

92. By unlawfully taking control of and using CI's Miners and Mining Containers, Defendants have wrongfully taken a benefit from Plaintiff's property, both the bitcoins mined and the value of the Miners and the Mining Containers from their use.

93. The Defendants have realized significant value from that benefit.

94. It would be inequitable for Defendants to retain that benefit without paying Plaintiff for the benefit's value.

95. CI is therefore entitled to restitution of that benefit, otherwise, Defendants will have been unjustly enriched.

**WHEREFORE,** Plaintiff Crypto Infiniti, LLC demands:

(A) an award of actual damages and punitive damages associated with Blockquarry's and Pantheon's conversion of CI's Miners and Mining Containers and in an amount to be determined by a jury at trial;

(B) an award of actual damages and punitive damages for Blockquarry's negligent and grossly negligent conduct in allowing Pantheon to take possession of CI's Miners and Mining Containers and in an amount to be determined by a jury at trial;

(C) an Order for the specific performance of the Settlement Agreement resulting in the immediate delivery of CI's Miners and Mining Containers, and an Order awarding CI permanent possession of the Miners and Mining Containers;

(D) an award of damages for the unjust enrichment of Blockquarry and/or Pantheon and in an amount properly determined by the Court;

(E) an Order awarding reasonable attorney's fees and costs to CI;

(F) an award of prejudgment interest;

(G) an award of legal interest; and

(H) any further relief that the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial on all claims triable to a jury.

*[SIGNATURE PAGE FOLLOWS]*

        Respectfully Submitted,

        **BURL F. WILLIAMS, P.A.**

        <u>/s/ Burl F. Williams</u>
        Burl F. Williams (FED. BAR NO. 10556)
        201 Riverplace, Suite 501
        Greenville, South Carolina 29601
        (864) 546-5035
        burl@burlfwilliams.com

        ***Counsel for Plaintiff Crypto Infiniti, LLC***

September 6, 2024
Greenville, South Carolina