### Hosting, Power, and Security Agreement

This Hosting and Security Agreement ("**Agreement**") is effective as Service Commencement Date ("**Effective Date**"), by and between Bit5ive, a Florida LLC ("**Host**"), and the client listed below ("**Client**", and together with the Host, the "**Parties**"), for bitcoin mining hosting and related services.

WHEREAS, Client's information is as follows:

| | |
|---|---|
| Client Name: | Crypto Infiniti LLC |
| Client Email: | info@cryptoinfiniti.com |
| Client Address: | 200 S. Virginia 8th Floor. Reno Nevada 89501 |
| Monthly Hosting Rate: | Actual Electric Consumption of Client Equipment at $0.055/kWh |
| Total Power Supply: | Eight (8) mega watts |
| Upfront Payment Due: | Total three (3) month electric consumption of 2,240 equipment in Exhibit A |
| | 1st Payment at Signing: $500,000 |
| | 2nd Payment of $ 443,488 in 45 days from 1st payment |
| Estimated Service Commencement Date: 98 days from date of first payment | |

WHEREAS, Host is a hosting provider of turnkey bitcoin mining services, and Client seeks to utilize Host's services.

NOW, THEREFORE, in consideration of the premises and of the mutual promises herein contained, the parties agree as follows:

1. **Host Service Obligations.**

    1.1.    Services. Client has, or shall promptly, deliver the Digital Asset mining equipment listed on **Exhibit A** attached hereto (the "**Client Equipment**") to Host. Host shall receive and test Client's Equipment, provide rack space allocation for Client's Equipment ("**Client Space**"), installation services, electrical power supply, cooling infrastructure, network connectivity, and technical support, as outlined in Section 1.4, 1.5, and 1.6 (collectively, the "**Services**"), for the Term (as defined in Section 3.01). Host represents and warrants that it has the capability to host and repair the exact models of mining equipment listed on Exhibit A.

    1.2    Installation and Testing. Upon receipt of Client's Equipment, Host shall perform commercially reasonable testing in accordance with Host's equipment testing procedures and notify Client of any malfunctioning Client Equipment within 48 hours of discovering the malfunction. Host shall install properly functioning Client's Equipment in the Client Space under the supervision of the Client's assigned supervisor. Host shall be liable for any damage to the equipment caused by the technical irregularity performed by the Host during the installation. The location of the Client Space shall be determined by Host, in its sole discretion, provided, however, that Client's reasonable preferences identified to Host may be considered. Host shall not be liable for any preexisting defects or malfunctions in Client's Equipment or for failing to identify any hidden defects during installation or testing.

    1.3    Commencement Date. Host shall make commercially reasonable efforts to begin providing Services on the Estimated Service Commencement Date identified in the preamble of this Agreement, provided, however, that, subject to Section 3(c), Host shall not be responsible for any delay in the date Service begins for any reason, including delay in receipt of Client's Equipment,

force majeure, lack of available rack space, or electrical or network connectivity problem. Notwithstanding the foregoing, if there is such a delay, Host shall refund to Client the monthly hosting rate, on a pro-rated basis, for the amount of time of such delay. The Host agrees the Commencement Date will be the date that 95% of the equipment is on and commissioned in working order.

1.4.    Electrical Power Supply. Host shall provide all electrical power required by Client's Equipment to function for its intended purposes.

1.5.    Maintenance. Host shall perform such maintenance actions as Host deems necessary or desirable with respect to the buildings and facilities owned or leased by Host in which the Client Space is located ("**Data Center**"), and maintain Host's network ("**Maintenance**"). Client acknowledges and agrees that the performance of Maintenance may cause the network to be temporarily inaccessible and the Services temporarily unavailable to Client. Host is responsible to all maintenance of all the containers on site purchased by the Client. Host shall use commercially reasonable efforts to conduct such Maintenance in a manner so as to avoid or minimize the unavailability of the Services. If Maintenance is expected to interrupt the availability of Services, Host shall give Client notice 48 hours prior by e-mail prior to conducting such maintenance, identifying the time and anticipated duration of the Maintenance. Host shall be responsible to maintenance of all the containers on site purchased by the Client.

1.6.    Repairs. Host shall monitor Client's Equipment and shall, within a reasonable period, contact Client if any of Client's Equipment is not operational. At Client's request, Host shall perform diagnostic and repair engineering work ("**Engineering Work**") on Client's Equipment. Host shall be the exclusive provider of Engineering Work. Engineering Work shall be billed in hour increments and shall include all time expended to diagnose problems, communicate and receive Client instructions, perform repairs and report results, unless the problems and the related Engineering Work are due to actions or inactions of Host, in which case Host shall bear the cost of such Engineering Work. Engineering Work will be billed at the rate of $25.00 per hour, not including the cost of any materials or equipment supplied or purchased by Host. Host agrees to use commercially reasonable efforts in carrying out the Engineering Work and shall be responsible for any and all losses resulting therefrom. Host shall use its best efforts to provide necessary Engineering Work in a timely manner. Client hereby authorizes Host to open and modify Client Equipment for repairs requested in accordance with this Section 1.05, and acknowledges that such requests may void the warranty of the equipment. Any hardware repair or replacement determined necessary by Host shall be as agreed by the parties prior to making additional purchases. Host shall be responsible to perform any repair needed and the cost of repair of all the containers on site purchased by the Client.

1.7.    Downtime. Except in the event of Client's Equipment failure, and force majeur conditions, each month, Host shall provide the Services to Client ninety five percent (95%) of the time[1] ("**Minimum Service Level**"). In the event that Services are not provided at the Minimum Service Level, and in addition to any and all remedies available at law or equity, Client shall receive a credit equal and limited to a discount in proportion to the Monthly Rate for the amount of downtime beyond the Minimum Service Level ("**Service Level Credit**").[2] The Service Level Credit shall be applied in equal installments over the Clients next two (2) monthly payments. In the last two (2) months of the term any Service Level Credit must be refunded for its cash value.

3.    **Client Obligation**

3.1.    Accurate Information. Client shall provide Client's Bitcoin address to Host in compliance with Host's Bitcoin address procedure. Client shall verify that Host has correctly installed Client's Bitcoin address and shall immediately notify Host if there is any inaccuracy in Client's Bitcoin address.

3.2.    Security. Client shall provide all end-user equipment, software and all other telecommunications and related equipment that Client deems necessary or desirable for Client's receipt of Digital Assets. Host shall be solely responsible for installation, maintenance, configuration,

connection, inter-connection, and all other support in connection with all equipment and personal property to be used by Client to access the Host website and receive and store Digital Assets. Client shall keep Client's Digital Assets, including Client's private key, secure. Host does not provide, and Client shall hold Host harmless from, remote user or remote access security with respect to any of Client's Equipment or the Data Center, and shall be solely responsible for remote user access security and remote network access to Client's Equipment. Host shall employ best efforts to ensure the security of Client's Equipment and the Data Center from unauthorized on site or local access. Host shall not provide any service to detect or identify any remote security breach of Client's Equipment or the Data Center, but shall detect and identify local security breaches and take reasonable steps to prevent such breaches. Host does not provide any tests employing tools and techniques intended to gain unauthorized remote access to Client's Equipment or Client's personal property, but shall take measures to ensure that there is no unauthorized local access to Client's Equipment and Client's personal property.

3.3.    Compliance with Laws. Client shall at all times comply with the laws, regulations and rules of any applicable governmental or regulatory authority, including, without limitation, Money Service Business regulations under the Financial Crimes Enforcement Network ("**FinCen**"); state money transmission laws; laws, regulations, and rules of relevant tax authorities; applicable regulations and guidance set forth by FinCEN; the Bank Secrecy Act of 1970; the USA PATRIOT Act of 2001; AML/CTF provisions as mandated by U.S. federal law and any other rules and regulations regarding AML/CTF; issuances from the Office of Foreign Assets Control ("**OFAC**"); the National Futures Association; the Financial Industry Regulatory Authority; and the Commodity Exchange Act.

4.    **Term & Right Of Termination**.

4.1.    Initial Term. The term of the Agreement shall begin on the Commencement Date and end on the first anniversary of the Effective Date ("**Initial Term**"). At the end of the Initial Term, this Agreement shall expire.

4.2    Termination.

(a)    Termination by Either Party. This Agreement may be terminated by either Party, at any time, without liability to the other Party, for any one or more of the following: (i) the non-terminating Party breaches any material term of this Agreement and fails to cure such breach (if susceptible to cure) within fifteen (15) days after receipt of written notice of the same (provided, however, in the event this Agreement provides that termination of any rights shall be immediate for any specific breach, then no such notice period shall not be required); (ii) the non-terminating Party becomes the subject of a voluntary or involuntary proceeding relating to insolvency, bankruptcy, receivership, liquidation, or reorganization for the benefit of creditors, and such petition or proceeding is not dismissed within sixty (60) days of the filing thereof; or (iii) a court or other government authority having jurisdiction over the Services prohibits Host from furnishing the Services to Client (each, a "Default"). Client may also terminate this Agreement if Client provides Host with written notice of non-renewal at least thirty (30) days before the end of the Term, or (ii) Service has not started as of the date six (6) months after the Estimated Service Commencement Date.

(b)    Termination by Host. Host may terminate Client's rights to any or all Services if (i) Client fails to pay any sum for Services when such payment is due (and such failure remains uncured for a period of 30 days.)

(c)    Termination by Client. Client may terminate any or all Services if (i) Client provides Host with written notice of non-renewal at least ninety (90) days before the end of the Term, (ii) Service has not started as of the date two (2) months after the Estimated Service Commencement Date, or (iii) Client pays a termination fee in the amount of fifty percent (50%) of the remaining fees for the Term,

4.3.    Return of Client Mining Equipment. Upon Client's request, and provided that Client is

3

current on all amounts due to Host, Host shall return Client's Equipment. Shipping, handling, and insurance costs shall be paid by Client to Host in advance. Host shall ensure that Client's Equipment is returned undamaged. Host shall purchase insurance on all such shipments at Client's cost,. Upon termination of this Agreement for any reason, if Client does not provide return directions within fifteen (15) days of termination of this Agreement, Host shall dispose of Client's Equipment and account to the Client for any proceeds net of costs. Host is not responsible for any cosmetic damage or operation deficiency from Client's Equipment, and Host will not repair or reimburse the Client in any form.

5.  **Invoice, Rates And Payment Terms.**

    5.1.  Invoice. Host will provide an invoice to the Client setting out the all Fees and Services, including as set out in the Rates below, and for any Repairs provided under this agreement. The invoice will be provided by the Host to the Client via email no later than 5 days past the end of month to an address specified by the Client.

    5.2  Rates. Host will invoice, via electronic communication, Client for all Services on a monthly basis, at the rate set forth in the preamble and in the agreement or as agreed in writing between the parties from time to time, setting out the basis of fees. The Host will invoice for the Monthly rate in advance and all other charges in areas.

    5.3.  Payment Term. Client shall pay all invoices in within 10 days of receipt, with time is of the essence in the payment of each and every invoice. If any invoice amount shall be due and unpaid on the fifth (5th) day following the due date of such invoice (subject to a Disputed Invoice), the Host may turn off Client's Equipment, and/or disable Client's access to accounts until all fees due to Host are paid in full, or redirect the Clients equipment for the Hosts benefit until payment is made. If after 30 days the Host continues to be unpaid, the Host may (i) terminate Service, and must apply the Security Deposit to the outstanding balance and, subject to their continuing to be an outstanding balance, (ii) seize and dispose of or sell the Client's Equipment for market value and use the proceeds to satisfy any amounts due to the Host (including disposal costs) by Client and account to the Client for the balance of proceeds.

    5.4.  Payment Currency and Taxes

    (a) Except for payments made in United States Dollars or USD Tether (USDT, equivalent to US Dollar), Host reserves the right to reject any payment, or require additional payment based on the conversion rate of such payment to United States Dollars.

    (b) Client shall be responsible for all taxes (including, without limitation, sales, use, transfer, privilege, excise, consumption and other taxes), fees, duties, governmental assessments, impositions and levies, related to the provision of Services.

    5.5.  Rate Changes. Host reserves the right to modify its rates (a) at the end of the agreement Term for the renewal term, provided Host notifies Client at least ninety (90) days in advance of the effective date of such rate change.

    5.6.  Security Deposit. A deposit equivalent to One (1) month total estimated Client Equipment's power consumption multiplied by electricity rate per Agreement shall be required at the execution of the agreement. The security deposit shall be returned within 3 business days to Client at the end of the Agreement Term. Client shall not be entitled to a refund of the deposit if any damages, default in payment, or overages are incurred.

    5.7.  Disputed invoices. Any disputed invoices must be registered in writing within thirty (30) days of the invoice date and the undisputed portion paid in full. Disputes registered after thirty (30) days must be paid in full first. Client waives the right to dispute an invoice amount after sixty (60) days past the invoice date. Any disputed amounts resolved in favor of Client will be credited to Customer's account and amounts payable to Host shall be paid within ten (10) days of dispute resolution.

5.8.    Upfront Payment. An Upfront Payment equivalent to the rate for Two (2) months total estimated Client Equipment's power consumption multiplied by electricity rate per Agreement plus Security Deposit stated in (5.6) shall be required at the execution of the agreement. The upfront payment shall serve as the First, and Last month payment of Client's term and Security Deposit shall be returned at the end of term per (5.6). Any remaining left from the Upfront Payment shall be returned together with Deposits within 3 business days

7.   **SECURITY INTEREST**. CLIENT HEREBY GRANTS HOST A SECURITY INTEREST IN ALL CLIENT'S EQUIPMENT IN HOST'S POSSESSION, NOW OR AT ANY TIME HEREAFTER, IN ORDER TO SECURE THE TIMELY PERFORMANCE OF THIS AGREEMENT BY CLIENT AND SECURE THE PAYMENT OF ALL INVOICES, CHARGES, AND COSTS. FURTHERMORE, CLIENT GRANTS HOST A SECURITY INTEREST IN ALL CLIENT'S EQUIPMENT FOR THE PAYMENT OF ENGINEERING WORK, LABOR OR OTHER CHARGES THAT ARE DUE AND UNPAID BY THE CLIENT.

8.   **Waivers**

8.1.    Digital Assets. Host does not own or control any Digital Assets the Equipment and does not own or control the underlying software protocols of Digital Asset networks which govern the operation of Digital Assets. Host is not responsible for the operation of the underlying protocols, and makes no guarantees regarding their security, functionality, or availability.. Host shall not be liable for any damage or interruptions caused by any computer viruses, spyware, scamware, trojan horses, worms, or other malware that may affect Client's computer or other equipment, or any phishing, spoofing, domain typosquatting, or other attacks, operator errors, , or any force majeure. If this disclaimer of liability section is deemed to conflict with any other section of this agreement, this disclaimer of liability section supersedes the other section (collectively, "**Hacking**"). For purposes of this Agreement, "**Digital Asset**" means any digital asset, cryptocurrency, virtual currency, digital currency, or digital commodity, including, without limitation bitcoin and ether, which is based on the cryptographic protocol of a computer network that may be (a) centralized or decentralized, (b) closed or open-source, and (c) used as a medium of exchange and/or store of value.

8.2.    Limitation on Liability. Client understands and agrees that use of telecommunications and data communications networks and the Internet may not be secure and that connection to and transmission of data and information over the Internet and such facilities provides the opportunity for unauthorized access to wallets, computer systems, networks, and all data stored therein. Information and data transmitted through the Internet or stored on any equipment through which Internet information is transmitted may not remain confidential and Host does not make any representation or warranty regarding privacy, security, authenticity, and non-corruption or destruction of any such information unless such destruction or other loss is caused by Host. Host warrants that the Services or Client's use will be uninterrupted, error-free, and secure as set forth in this Agreement. Use of any information transmitted or obtained by Client from Host is at Client's own risk. Unless caused by Host, Host is not responsible for the accuracy or quality of information obtained through its network, including as a result of failure of performance, error, omission, interruption, corruption, deletion, defect, delay in operation or transmission, computer virus, communication line failure, theft or destruction or unauthorized access to, alteration of, or use of information or facilities, or malfunctioning of websites. Host does not control the transmission or flow of data to or from Host's network and other portions of the Internet, including the Digital Asset networks. Such transmissions and/or flow depend in part on the performance of telecommunications and/or Internet services provided or controlled by third parties. At times, actions or inactions of such third parties can impair or disrupt Host or Client's connections to the Services. Host does not represent or warrant that such events will not occur and Host disclaims any and all liability resulting from or related to such acts or omissions, unless it is the cause of such liability.

8.3.     No Digital Asset Warranty. Host does not make, and hereby disclaims, any and all representations and warranties, express or implied, whether in fact or by operation of law, statutory or otherwise, including, but not limited to, any representation or warranty regarding the price or liquidity of any Digital Asset, either now or in the future, warranties of merchantability, habitability, marketability, profitability, fitness for a particular purpose, suitability, noninfringement, title, or arising from a course of dealing, or trade practice.

8.4.     Electronic Communications Privacy Act Notice. Host may monitor any and all communications through or with the Data Center. Client agrees Host is not considered a "secure communications medium" for the purposes of the Electronic Communications Privacy Act of 1986, and that no expectation of privacy is thereby created.

8.5.     Security. The Security of Client's account and any Digital Assets is solely the Client's responsibility except for the on-site and local security which shall be provided by Host. Client shall notify Host if Client suspects Client's account or Digital Assets have been hacked, stolen, accessed without authorization, or otherwise compromised. If Host has probable cause to suspect any security violations have occurred related to Client's account or Digital Assets, Host may suspend access to Client's account and hardware pending resolution. Host may cooperate in any government or legal investigation regarding any aspect of the Services.

8.6.     Legal Processes. Host and its affiliates, service providers, and their respective officers, directors, agents, joint venturers, employees and representatives, may comply with any writ of attachment, execution, garnishment, tax levy, restraining order, subpoena, warrant or other legal process, which Host reasonably and in good faith believes to be valid. Host may notify Client of such process by electronic communication. Host may charge Client for associated costs, in addition to any legal process fees. Client agree to indemnify, defend, and hold all of us harmless from all actions, claims, liabilities, losses, costs, attorney's fees, or damages associated with Host's compliance with any process that Host reasonably believes in good faith to be valid.

9.     **Representations, and Indemnification.**

9.1.     Mutual Representations. Host represents, warrants and covenants that: (a) Host has full power and authority to enter into this Agreement and perform Host's obligations hereunder, and (b) Host's performance of its obligations hereunder will not violate any applicable laws or require the consent of any third party.

9.2.     Client Representations. Client represents, warrants and covenants that: (a) Client has full power and authority to enter into this Agreement and perform Client's obligations hereunder, (b) Client has clear title, free and clear of all security interests or liens, to Client's equipment, including the legal right to use, operate and locate Client's Equipment in the Data Center; and (c) Client's performance of its obligations hereunder and receipt of the Digital Assets will not violate any applicable laws or require the consent of any third party.

9.3.     Indemnity. In addition to any other applicable rights under this Agreement, Client agrees to indemnify, defend and hold harmless Host and its officers, managers, partners, members, agents, employees, affiliates, attorneys, heirs, successors and assigns (collectively "**Host Parties**") from any and all claims, demands, actions, suits, proceedings, and all damages, judgments, liabilities, losses, and expenses, including, but not limited to, reasonable attorneys' fees ("**Losses**"), arising from or relating to (a) any legal, regulatory or governmental action against or including Client or (b) any claim related to Hacking unless Host is the cause of such Hacking.

**10. Mutual Confidentiality.**

10.1. <u>Disclosure and Use</u>. Each Party agrees that it will not use in any way, nor disclose to any third party, the other Party's Confidential Information, and will take reasonable precautions to protect the confidentiality of such information, as stringently as it takes to protect its own Confidential Information, but in no case will the degree of care be less than reasonable care. Nothing herein shall preclude disclosure by a Party to that Party's attorneys, accountants and employees who have a bona fide need to know the other Party's Confidential Information in connection with the receiving Party's performance under this Agreement. Each Party agrees to only make copies of the other's Confidential Information for purposes consistent with this Agreement, and each Party shall maintain on any such copies a proprietary legend or notice as contained on the original or as the disclosing Party may request. For purposes of this Section 8.01, "**Confidential Information**" means information which (i) derives actual or potential economic value from not being generally known to, and not available through proper means, by other persons who could obtain economic value from receipt or use of such information, (ii) is the subject of reasonable efforts by its owner to maintain its confidentiality or secrecy, or (iii) is by its nature confidential, trade secrets or otherwise proprietary to its owner. Confidential information includes the terms and conditions of this Agreement, software source and object code, inventions, know-how, data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, configurations, plans, processes, financial and business plans, names of actual or potential Clients or suppliers, Data Center configuration, and proprietary technology developed or created by Host or Client, including Client or Host's operations, design, content, hardware designs, algorithms, software (in source and object forms), user interface designs, architecture, class libraries, and documentation (both printed and electronic), know-how, trade secrets and any related intellectual property rights throughout the world, and any derivative works, improvements, enhancements or extensions thereof.

10.2. <u>Exclusions from Confidentiality Obligations</u>. Notwithstanding the confidentiality obligations required herein, neither Party's confidentiality obligations hereunder shall apply to information which: (a) is already known to the receiving Party (other than the terms of this Agreement); or (b) is required to be disclosed by Law, provided, however, if either Party is at any time requested or required to disclose any information supplied to it in connection with this Agreement, the Party agrees to provide the other Party with prompt notice of such request.

**11. Remedies.**

11.1. <u>Service Failures</u>. Except as set forth in Section 1.06, payments due to Host are not subject to Client's charge, offset, diminution or other deduction. In the event that Host fails to provide Service and such failure was the result of (i) any Force Majeure condition, (ii) any actions or inactions of Client, including any activity under Client's control or within the obligations undertaken by Client (including, without limitation, Hacking, inaccurate or corrupt data, use of the Services other than in accordance with the written directions of Host, failure or inability of Client to receive Digital Assets, failure of the underlying software protocols of the Digital Asset networks, and problems in Client's local software environment, then Host shall have no obligation to credit Client any amount for any such failure.

11.2. <u>Alternative Dispute Resolution</u>. Except as set forth in this Section 9, any and all disputes, complaints, controversies, claims and grievances arising under, out of, in connection with, or in any manner related to this Agreement or the relationship of parties hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The obligation to arbitrate shall extend to any affiliate, subsidiary, officer, employee, shareholder, principal, agent, trustee in bankruptcy or guarantor of a party making or defending any claim hereunder. Any decision and award of the arbitrator shall be final, binding and conclusive

upon all of the parties hereto and said decision and award may be entered as a final judgment in any court of competent jurisdiction. Notwithstanding said Rules, any arbitration hearing to take place hereunder shall be conducted in Miami, Florida, before one (1) arbitrator who shall be an attorney who has substantial experience in commercial law issues. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Florida (not including the choice of law rules thereof). However, neither Party shall institute an arbitration, or any other proceeding to resolve such disputes between the parties before that Party has sought to resolve disputes through direct negotiation with the other Party. If disputes are not resolved within three (3) weeks after a demand for direct negotiation, the parties shall attempt to resolve disputes through mediation conducted in Miami, Florida. If the parties do not agree on a mediator within ten (10) days, either Party may request the American Arbitration Association to appoint a mediator who shall be an attorney who has substantial experience in commercial law issues. If the mediator is unable to facilitate a settlement of disputes within forty-five (45) days, the mediator shall issue a written statement to the parties to that effect and the aggrieved Party may then seek relief through arbitration as provided above. The fees and expenses of the mediator shall be split and paid equally by each of the parties. In the event of any arbitration between the parties hereto involving this Agreement or the respective rights of the parties hereunder, the Party who does not prevail in such arbitration shall pay all the prevailing Party's reasonable attorneys' and experts' fees, costs and expenses incurred by the prevailing Party in resolving said matter. As used herein the term 'prevailing Party' shall include, but not be limited to, a Party who obtains legal counsel or brings an action against the other by reason of the other's breach or default and obtains substantially the relief sought whether by compromise, settlement, or judgment. execution of this Agreement, the parties consent to the jurisdiction of the American Arbitration Association and waive any objection which either Party may have to any proceeding so commenced based upon improper venue or forum non conveniens.

## 12    Miscellaneous Provisions.

12.1.    Modification. This Agreement may be modified only by a written instrument executed by authorized representatives of each of the Parties.

12.2.    Service Agreement. This Agreement is a services agreement and is not intended to and will not constitute a lease of or tenancy or other interest in the Data Center or any of premises owned or leased by Host, any equipment provided by the Host or any other real or personal property.

12.3.    Relocation of Client Equipment or Client Space. If it is necessary or desirable, for Host's efficient use of the Data Center, to relocate the Client Equipment or Client Space to another area in the Data Center(s), the Parties will cooperate in good faith with each other to facilitate such relocation. Host shall be solely responsible for the costs incurred by Host in connection with any such relocation. Relocation made by Host at the request of Client, will be at the sole expense of Client. Host will use commercially reasonable efforts to minimize and avoid any interruption in Services during such relocation.

12.4.    Force Majeure. Host shall not be responsible for any failure to perform its obligations under this Agreement if such failure is caused by hurricane, war, labor strike, terrorist act, fire, flood, earthquake, natural disaster, act of Government, or other events beyond the Host's reasonable control.

12.5.    Notice. Any notice required to be given hereunder may be delivered or furnished using electronic communications and shall be in writing and shall be deemed to have been delivered when sent.

12.6.    Assignment. Except as set forth herein, neither Party may assign this Agreement or resell the Services, or sublicense or sublease the Services without the prior written consent of the other,

provided, however, either Party may freely assign or transfer its rights or obligations under this Agreement if such transfer occurs by operation of law under a bona fide merger, divestiture, consolidation, or reorganization, or to any purchaser of all or substantially all of the assets of the business of the assigning Party, provided the assignee is bound by this Agreement, is financially able to complete its obligations, and is not a direct competitor of the non-assigning Party. The Parties expressly agree that Client may assign this Agreement or resell the Services, or sublicense or sublease the Services without the prior written consent of Host, in Client's sole and exclusive discretion.

12.7.  Entire Understanding. This Agreement constitutes the entire understanding and agreement of the Parties related to the subject matter hereof, and supersedes and replaces any and all prior or contemporaneous discussions, agreements and understandings related to such matters. This Agreement may be executed electronically in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.

12.8.  Attorneys' Fees. If either Party retains an attorney to enforce the terms of this Agreement or to collect money due hereunder, the prevailing Party shall be entitled to recover reasonable attorneys' fees, court costs and other related expenses incurred in connection therewith.

12.9.  Independent Contractors. Host and Client are independent contractors; this Agreement will not establish any relationship of partnership or agency. Client has no rights as a tenant or otherwise under any real property or landlord/tenant laws.

12.10.  Savings Clause. If any provision of this Agreement is adjudged by a court or arbitrator to be invalid, illegal or unenforceable, the same will not affect the validity, legality, or enforceability of any other provision of this Agreement. All terms and conditions of this Agreement will be deemed enforceable to the fullest extent permissible under applicable law.

12.11.  No Waiver. The failure by either Party to enforce any rights hereunder shall not constitute a waiver of such right(s) or of any other or further rights hereunder. The waiver of any breach or default of this Agreement will not constitute a waiver of any subsequent breach or default.

12.12.  Third Party Beneficiaries. There shall be no third party beneficiaries to this Agreement except for the assignees, sublicensees, subcontractors, or subtenants of Client.

12.13.  Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of Florida except its conflicts of law principles.

12.14.  Construction. Capitalized terms used but not defined in this Agreement shall have the meanings given to them in the Definitions, attached hereto as Schedule A. The recitals and preamble are incorporated herein as if set forth at length.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Hosting and Security Agreement as of the Effective Date.

**Bit5ive LLC**

By: _____

Name: Robert Collazo
Title: President and CEO

Email: robert@bit5ive.com

Address: 12301 NW 112 Ave
Medley, FL 33178


**Crypto Infiniti LLC**

By: _____

Name: Yi Lin

Title: Director

10

## Exhibit A

### Client Equipment

The client equipment is the combination of:

| QTY  | Description       |
|------|-------------------|
| 2240 | M20S / S19 / S19j |

## Exhibit B

DESCRIPTION OF EQUIPMENT, PURCHASE AND DELIVERY DETAILS

## SCHEDULE "A"

### DESCRIPTION OF EQUIPMENT, PURCHASE AND DELIVERY DETAILS

Description of Equipment:

Eight (8) substantially identical 40' Standard shipping containers, modified for use in Crypto Mining. Each container will be designed to hold and operate 280 S19 Antminers manufactured by Bitmain, or similar hardware, within 5% of specifications.

The major modifications include:

Structural: Long side louvers with additional vertical supports; entry door; framing for fans at door short end.

Interior: Rubber flooring; foamboard insulation; LED lighting; environment meters; two security cameras.

Racking: Four large industrial strength racks, each rack having 10 vertical shelves and fitting 7 miners per shelf. Each Pod5ive will be outfitted with 2 racks per side with a design that permits the miners' exhaust fans to be embedded in the foamboard insulation.

Networking: Shielded Cat 5e cabling from each miner to a Secondary network switch with one Secondary switch per rack. All Secondary switches will be aggregated via Cat 5e into an aggregator Primary switch. Customer will connect its own network into a router aggregator to the Primary switch. A server computer is provided using the Pod5ive monitoring software, or the customer's own software.

Airflow: 4 direct drive fans with 10 HP motors running on an independent Variable Frequency & Adjustable Speed Drive on a 60A 3P 415V breaker, each with a maximum of 29,500 cfm each. Intake air filtration and an evaporative cooler will process the incoming air.

Electrical: The Pod5ive will be delivered ready to accept 415V 3-phase electricity up to 2000A from a transformer. The Pod5ive will have 2 main breakers of 1000A each. Customer will provide electric service to the connection bar from the transformer to the block inside each main breaker.

Each Pod5ive will have 2 breaker panels feeding 30 smart power distribution units (3 per rack). Each PDU will have sufficient capacity to power 12 S19 miners at 240V and 12A. Networking equipment, evaporative cooler, security, server computer, sensors, and lights will be 120V circuit.

Deliver Location: 2000 Foster Mill Road, LaFayette, GA 30728
Deliver Date: Shall be shipped and installed on site priory to Commerce Date to allow enough time for installing of Buyer's mining hardware.

NOTE: Purchase of Pod5ive containers does NOT include mining hardware, except as indicated above. The foregoing shall not be intended to include all features and modifications to create a Pod5ive.
Additional specifications can be found in the attached brochure