EXHIBIT 2

# SALE AND PURCHASE AGREEMENT

This Sale and Purchase Agreement ("**Agreement**"), dated as of this June 29, 2021, is entered into between Uptime Armory LLC, (the "**Company**") and Crypto Infiniti LLC (the "**Buyer**").

**WHEREAS,** the Company wishes to sell to the Buyer, and the Buyer wishes to purchase from the Company the rights and obligations of the Company to the Equipment (as defined herein), subject to the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the mutual agreements and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, it is mutually agreed and covenanted by and between the parties to this Agreement, as follows:

## INTERPRETATION

**1.     Definitions**

In this Agreement and in the schedules hereto, the following terms and expressions will have the following meanings:

"**Acceptance**" means the Company's acceptance of this Agreement by countersigning this Agreement;

"**Agreement**" shall have the meaning set forth in the introductory paragraph;

"**Buyer**" shall have the meaning set forth in the introductory paragraph;

"**Company**" shall have the meaning set forth in the introductory paragraph;

"**Conditions**" means the terms and conditions set out in this Agreement (as may be amended and varied from time to time);

"**Delivery Date**" means the date upon which the Equipment is delivered by the Buyer at the designated location that has been indicated in Schedule "A";

"**Equipment**" means the equipment as set out in Schedule "A";

"**Intellectual Property Rights**" means patents, utility models, rights to inventions, copyright, trade-marks and service marks, business names and domain names, rights in get-up and trade dress, goodwill and the right to sue for passing off or unfair competition, rights in designs, database rights, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets), and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, such rights and all similar or equivalent rights or forms of protection which subsist or will subsist now or in the future in any part of the world; and

"**Taxes**" means sales, use, withholding, value-added or other taxes in connection with the sale and delivery of the Equipment.

**2.     Interpretation.**

(1) Section, Schedule and paragraph headings shall not affect the interpretation of this Agreement.

(2) Person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

(3) Reference to a company shall include any company, corporation or other body corporate, wherever and however incorporated or established.

(4) Unless the context otherwise requires, words in the singular shall include the plural and in the plural include the singular.

(5) Reference to a statute or statutory provision shall include all subordinate legislation made as at the date of this Agreement under that statute or statutory provision.

(6) References to Section are to the Section of this Agreement.

3. **Currency.** Unless otherwise indicated, all references to dollar amounts in this Agreement are expressed in the United States dollar.

4. **Governing Law.** This Agreement and any disputes or claims arising out of or in connection with it or its subject matter or formation (including without limitation disputes or claims) are governed by and construed in accordance with the laws of the state of Florida. Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity hereof, shall be referred to and finally resolved by binding arbitration administered by a single arbitrator of the American Arbitration Association in accordance with its then-applicable Commercial Arbitration Rule. The seat, or legal place, of arbitration shall be Miami, Florida. The language to be used in the arbitral proceedings shall be English.

5. **Schedules.** The following are the Schedules to this Agreement: Schedule "A", which shall be the description of Equipment

## EQUIPMENT SALE

6. **Basis of the Agreement.**

    (1) These Conditions apply to the Agreement to the exclusion of any other terms that the Buyer seeks to impose or incorporate, or which are implied by trade, custom, practice or course of dealing.

    (2) This Agreement constitutes an offer by the Buyer and acceptance by the Seller pertaining to the purchase and sale of the Equipment in accordance with these Conditions.

    (3) The Agreement constitutes the entire agreement between the parties in relation to the subject matter herein. The Buyer acknowledges that it has not relied on any statement, promise, representation, assurance or warranty made or given by or on behalf of the Company which is not set out in the Agreement.

    (4) Any samples, drawings, descriptive matter, or advertising produced by the Company and any descriptions or illustrations contained in the Company's catalogues or brochures are produced for the sole purpose of giving an approximate idea of the Equipment described in them. They shall not form part of the Agreement or have any contractual force.

7. **Quantity and Description.**

    (1) The quantity and description of the Equipment shall be as set out in Schedule "A" attached hereto.

    (2) Any typographical, clerical or other error or omission in any sales literature, quotation, price list, acceptance of offer, invoice or other document or information issued by the Company shall be subject to correction without any liability on the part of the Company.

    (3) The Company reserves the right (but does not assume the obligation) to make any changes in the specification of the Equipment which are required to conform with any applicable laws and regulations or which do not materially affect their quality or performance.

    (4) The Company's employees, contractors and agents are not authorized to make any representations or contractually binding statements concerning the Equipment.

## SALE AND PURCHASE

8.  **Purchased Equipment.** The Company hereby sells to the Buyer and the Buyer hereby purchases from the Company the equipment described in Schedule "A" attached hereto and incorporated herein, and licenses the software contained therein (hereinafter "**Equipment**").

9.  **Purchase Price.** The Buyer shall pay to the Company for the Equipment and for all obligations specified herein, as full and complete consideration therefor, the sum of $1,216,000.00 (the "**Purchase Price**"), subject to Section 11.

The Purchase Price excludes Taxes. The Buyer is responsible for payment of all applicable Taxes. Both parties are responsible and liable for their own respective corporate and income taxes. All prices are exclusive of delivery, packaging, packing, shipping, carriage, insurance and other charges and duties and importation costs. The Buyer is responsible for all such costs.

10. **Payment of Purchase Price.**

    (1) The Buyer agrees to pay the Company the Purchase Price of the sum of $1,216,000.00 (representing 100% of the Purchase Price) inclusive of taxes, fees, and other charges as follows: within seven (7) business days of signing this Agreement.

          a) $500,000 shall be due upon signing this Agreement as a deposit

          b) $136,256 shall be following in 45 days of the first payment

          c) $579,744 immediately prior to shipping of the Equipment

    (2) The Company shall maintain a security interest in the device and reserves the right to remove from the delivery location, or any other location, if all payment terms are not met. Any costs associated with such action will be at the expense of the Buyer.

    (3) In the event that the Buyer requests that the Equipment is to be delivered to a specified location then, the Company shall, in addition to the Purchase Price, invoice the Buyer for (a) the Taxes; (b) delivery costs of the Equipment, if applicable; (c) insurance costs to deliver the Equipment, if applicable; and (d) any other costs associated with delivering the Equipment. Provided that Buyer has approved the invoice for such delivery in writing in advance, the Buyer shall pay the invoice in full, in cleared funds, prior to the Company shipping the Equipment. For greater clarity, such approval shall not be unreasonably withheld, so long as the costs associated with delivering the Equipment are commercially reasonable. The risk of loss and damage to the Equipment shall pass to the Buyer immediately upon the Equipment being picked up by or on behalf of the Buyer, its agent or transport carrier, at the Company's facilities, and thereafter the Company shall not be responsible for any loss or damage to the Equipment.

    (4) If the Buyer fails to make payment in full on the due date set forth above, and the conditions for the payments have been fully met by Company, then the whole of the balance of the price of the Equipment then outstanding shall become immediately due and payable and, without prejudice to any other right or remedy available to the Company, the Company shall be entitled to: (a) charge interest on the amount outstanding from the due date to the date of receipt by the Company (whether or not after judgment), at the monthly rate of the lesser of 1%, accruing on a daily basis and being compounded monthly until payment is made, or the highest rate chargeable by law, whether before or after any judgment; (b) suspend all further manufacture, delivery, installation or warranty service until payment has been made in full; and (c) make a storage charge for any undelivered Equipment at its current rates from time to time.

(5) Company may, without prejudice to any other rights it may have, set off any liability of the Buyer to the Company against any liability of the Company to the Buyer.

**DELIVERY OF EQUIPMENT AND ACCEPTANCE**

11. **Delivery.**

    (1) The Company shall not be under any obligation to supply all or any of the Equipment ordered by the Buyer, until Acceptance. Upon Acceptance of this Agreement, the Buyer shall be bound by the terms thereof. The Company shall deliver the Equipment on the date(s) and location(s) specified in Schedule "A" attached hereto.

    (2) The Buyer shall be responsible (at the Buyer's cost) for preparing the delivery or pick-up location, as applicable, for the Equipment and for the provision of all necessary access and facilities reasonably required for the Buyer to take possession of and install the Equipment. If the Company is prevented from carrying out delivery or installation on the specified date because no such preparation has been carried out, the Company may levy additional charges to recover its loss arising from this event.

    (3) The Equipment shall be at the risk of the Company to the Buyer at the place of delivery specified by the Company in Schedule "A". Buyer shall be deemed to have accepted the Equipment no later than seven (7) days following the Delivery Date. Ownership of the Equipment shall pass to the Buyer upon completion of the seven (7) day inspection time frame, and once final payment of the Purchase Price is completed.

    (4) If the delivery is not completed before February 8, 2022 (90 days after the specified date in Schedule "A"), the Client shall have the right to terminate the agreement and the Company shall refund all the payments which have been paid by the Client along with the accumulated penalty equal to the Prime Rate plus 5% (five percent) penalty on payments directly related to Section 10 which have been paid by the Client within 3 business days. **Prime Rate** shall mean for any day, the rate defined as the "prime rate" as published from time to time in the Eastern Edition of The Wall Street Journal as the average prime lending rate for seventy-five percent (75%) of the United States' thirty (30) largest commercial banks, or if The Wall Street Journal shall cease publishing the "prime rate" on a regular basis, such other regularly published average prime rate application to such commercial banks as is acceptable to Buyer in its reasonable discretion.

12. **Risk and Property.** The Equipment shall be at the risk of the Company to the Buyer at the place of delivery specified by the Company in Schedule "A". The Equipment shall be at the risk of the Buyer to the Buyer at the place of delivery specified by the Buyer in Schedule "A". The Company shall on-load the Equipment at the Buyer's risk.

13. **Inspection and Testing of Equipment.** Company shall:

    (a) test and inspect the Equipment prior to notifying the Buyer that the Equipment is ready for delivery to ensure that it complies with the requirements of the Agreement; and

    (b) if so requested by the Buyer, give the Buyer reasonable advance notice of such tests (which the Buyer shall be entitled to attend).

1

Upon confirmation that the Equipment has arrived at the Buyer's final destination ("Buyer's Facility"), that the Buyer's Facility has met all technical requirements necessary to operate the Equipment, and that all required installation equipment and machinery is at the Buyer's Facility, the Company shall send up to two (2) technicians to the Buyer's Facility to install the Equipment, for a maximum of two (2) working days, at no additional cost to the Buyer. If there is a delay in installing the equipment due circumstances outside of the Company's control, the Buyer shall reimburse the Company for any additional reasonable

and documented costs associated with the technicians' expenses, including travel, accommodations, meals, and salaries, for any days beyond the initial two (2) days at the Buyer's Facility, within ten (10) days.

**REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS**

15. **Representations, Warranties and Acknowledgements of the Company.** Company warrants to the Buyer that the structural components (frame) of the Equipment are free from defects of workmanship and materials, and that under normal use and conditions, it will operate substantially as it is intended to perform for a period of thirty (30) days following delivery. The

    Company undertakes (subject to the remainder of Section 5.1), at its option, to repair the Equipment (including with refurbished parts or refurbished Equipment) which is found to be defective as a result of faulty materials or workmanship within thirty (30) days of delivery. Any repaired or replacement Equipment shall be under warranty for the unexpired portion of the thirty (30) day period. Component parts shall be under the original limited manufacturer's warranty, which shall vary by Component, but is limited to a maximum of one (1) year following delivery.

16. Buyer acknowledges that all components of the Equipment are warranted only in accordance with the limited warranty provided by the manufacturers and that the Company is passing through to Buyer only the manufacturer's warranty for the goods and that Buyer shall look solely to the manufacturer of the goods for all warranty claims, defects, and the like. Buyer hereby waives, releases, and renounces all other warranties, guarantees, representations, obligations and liabilities of Company and acknowledges that the COMPANY MAKES NO WARRANTY EITHER EXPRESS OR IMPLIED AND MAKES NO WARRANTIES OF MERCHANTABILITY OR ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE.

    Given that the Component parts may not be designed to serve the end-purpose of the Equipment due to the Equipment's specialized nature, the COMPANY MAKES NO WARRANTY THAT THE COMPONENT PARTS' LIMITED WARRANTIES HAVE NOT BEEN VOIDED DUE TO THE USE OF THE COMPONENT WITHIN THE EQUIPMENT AND BUYER AGREES TO ASSUME THE RISK OF VOIDING THE COMPONENT PARTS' LIMITED WARRANTY BY USING THE EQUIPMENT.

17. In cases where the Equipment is not located at Company's facilities, the Company shall not in any circumstances be liable for a breach of the warranty or undertake any warranty service contained in this Section unless:

    (a) the Buyer gives written notice of the defect to the Company within seven days (7) of the time when the Buyer discovers or ought to have discovered the defect; and

    (b) after receiving the notice, the Company is given a reasonable opportunity of examining such Equipment for the defect or malfunction, the Buyer follows Company's commercially reasonable instructions in bringing the Equipment to working condition, returns such Equipment to a repair facility specified by Company at the Company's cost for the examination and warranty service (if applicable) to take place there. If the Buyer does not follow the Company's commercially reasonable instructions in bringing the Equipment to working condition, the costs for the examination and warranty service shifts to the Buyer.

18. The warranty does not apply to (a) normal wear and tear and (b) damage or loss of the product caused by Force Majeure events pursuant to Section 24. In addition, in cases where the Equipment is not located at the Company's facilities, the warranty does not apply to:
    (a) damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(b) damage or loss of the product caused by undue physical or electrical stress, including but not limited to excessive moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(c) damage caused by operator error, or non-compliance with the Company's instructions as to the storage, installation, commissioning, electric powering, internet connectivity, use or maintenance of the product or (if there are none) good trade practice; and

(d) damage or loss of functionality due to interoperability with the Buyer's software and/or hardware.

19. **Representations, Warranties and Acknowledgements of the Buyer.** The Buyer warrants, represents and covenants to Company that it:

(a) shall be responsible for complying with any applicable laws and regulations governing (i) the importation of the Equipment into the country of destination (ii) all regulation surrounding the use of the equipment and (iii) the export and re-export of the Equipment, and shall be responsible for the payment of any duties on it;

(b) shall import, distribute, deploy and use the Equipment solely in compliance with all applicable laws and regulations;

(c) shall not (and shall not permit any person to) modify the Equipment, or reverse, assemble, reverse compile, or otherwise reverse engineer the Equipment for the purpose of attempting to discover any underlying proprietary information.

20. **Remedies.** Any liability of Company for non-completion of Delivery of the Equipment by Company shall in all circumstances be limited to the amount actually paid by Buyer for the Equipment.

If Company's performance of its obligations under the Agreement is prevented or delayed by any act or omission of the Buyer (other than by reason of a Force Majeure event under Section 24), the Buyer shall in all circumstances be liable to pay to Company all reasonable costs, charges or losses sustained by it as a result, subject to Company notifying the Buyer in writing of any such claim it might have against the Buyer in this respect.

In the event of any claim by the Buyer under the warranty given in Section 15, the Buyer shall notify the Company in writing of the alleged defect. The Company shall have the option of testing or inspecting the Equipment at its current location or moving it to the Company's premises (or those of its agent or sub- agent) at the cost of the Buyer. If the Buyer's claim is subsequently found by the Company to be outside the scope or duration of the warranty in Section 15, the costs of transportation of the Equipment, investigation and repair shall be borne by the Buyer.

21. **Confidentiality.** The Buyer shall keep in strict confidence all technical or commercial know-how, specifications, inventions, processes, or initiatives which are of a confidential nature and are identified in a clear and conspicuous manner that they are confidential and have been disclosed to the Buyer by the Company or its agents.

**LIABILITY AND INDEMNIFICATION**

22. **Limitation of Liability.** The following provisions set out the entire financial liability of the Company (including without limitation any liability for the acts or omissions of its employees, agents and sub-contractors) to the Buyer in respect of: (a) any breach of the Agreement howsoever arising; and (b) any representation, misrepresentation (whether innocent or negligent), statement or tortious act or omission (including without limitation, negligence) arising out of or in connection with the Agreement or the Equipment.

(a) All warranties, conditions and other terms implied by statute or common law are excluded from the Agreement to the fullest extent permitted by law.

(b) The Company shall not in any circumstances be liable, whether in tort (including without limitation for negligence or breach of statutory duty howsoever arising), contract, misrepresentation (whether innocent or negligent) or otherwise for: loss of profits, loss of business, depletion of goodwill or similar losses, loss of anticipated savings, loss of goods, loss of contract, loss of use, loss or corruption of data or information, or any special, indirect, consequential or pure economic loss, costs, damages, charges or expenses. The Company's total liability in contract, tort (including without limitation negligence and breach of statutory duty howsoever arising), misrepresentation (whether innocent or negligent), restitution or otherwise, arising in connection with the performance or contemplated performance of the Agreement shall be limited to the amount paid by the Buyer for the Equipment.

(c) Nothing in this Agreement excludes or limits the liability of the Company for: (a) death or personal injury caused by the Company's negligence; or (b) fraud or fraudulent misrepresentation, gross negligence or willful misconduct.

23. **Indemnification.** The Buyer agrees to indemnify, defend and hold the Company, its officers, directors, employees and agents, harmless from all loss, liability, claims or expenses (including reasonable attorneys' fees) arising out of any breach of the Agreement by the Buyer. The Company agrees to indemnify, defend, and hold the Buyer, its officers, directors, employees and agents, harmless from all loss, liability, claims or expenses (including reasonable attorneys' fees) arising out of any breach of the Agreement by the Company. Notwithstanding the preceding sentence, the Company shall not be responsible for any loss, liability, claims or expenses (including reasonable attorneys' fees) arising out of any delays accounted for in Section 11.

24. **Force Majeure.** Company shall not be liable to the Buyer for any delay or failure to perform its obligations under this Agreement, if such delay or failure arises from acts of God or any cause or causes beyond its reasonable control, including but not limited to:

    (a) Natural disasters such as floods, fire, lightning, or earthquakes;

    (b) Power, communication, or transportation delays or failures (other than a result of actions of the Company);

    (c) Casualty, war, terrorist activity, riots, or insurrections;

    (d) Industrial disturbances such as labor disputes, strikes, or lockouts;

    (e) Embargoes, blockages, or shortages of materials; and

    (f) Government actions, restrictions or regulations which go into effect after the effective date of this Agreement, or orders of any agency or subdivision thereof, or delays caused by such agencies.

    (g) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine or other employee restrictions.

**INTELLECTUAL PROPERTY RIGHTS**

25. **Intellectual Property Rights.**

(1) The Buyer acknowledges that all Intellectual Property Rights used by or subsisting in the Equipment are and shall remain the sole property of the Company or its affiliates or (as the case may be) third party rights, owner.

(2) The Company or its affiliates shall retain the property and copyright in all documents supplied to the Buyer in connection with the Agreement and it shall be a condition of such supply that the contents of such documents shall not be communicated either directly or indirectly to any other person, firm or company, other than the Buyer's officers, employees, agents, and advisors without the prior written consent of the Company.

(3) The Company's Intellectual Property Rights in and relating to the Equipment shall remain the exclusive property of the Company or its affiliates, and the Buyer shall not at any time make any unauthorized use of such Intellectual Property Rights, nor authorize or permit any of its agents or contracts or any other person to do so.

(4) The Buyer shall not market, distribute, white-label, license, or otherwise make available the Equipment to or through any person or company without: (i) the express prior written approval of the Company and (ii) first entering into a written licensing agreement with such Person or company on terms and conditions that Buyer has submitted to and have been approved Company, and designate the Company as an intended third-party beneficiary of that agreement. <u>Provided, however,</u> that nothing in this Section 25(4) shall limit the Buyer from freely exercising its ownership rights to re-sell, rent, or collateralize the Equipment

## **TERMINATION**

**26.** **Termination of the Agreement.**

(1) Without prejudice to any other right or remedy available, Company may terminate the Agreement or suspend any further deliveries under the Agreement without liability to the Buyer if:

    (a) the Buyer becomes insolvent;

    (b) any filings in relation to the winding up of the Buyer; and

    (c) if an administrator or receiver is appointed to manage the affairs of the Buyer;

(2) Any provision of this Agreement that expressly or by implication is intended to come into or continue in force on or after termination or expiry of this Agreement shall remain in full force and effect.

(3) Termination or expiry of this Agreement shall not affect any rights, remedies, obligations or liabilities of the parties that have accrued up to the date of termination or expiry, including the right to claim damages in respect of any breach of the Agreement which existed at or before the date of termination or expiry.

(4) Sections 21, 23, 25, 26 and 33 shall survive termination of the Agreement, however arising.

## **GENERAL**

27. **Notices.** Any notice or invoice required or authorized to be given hereunder or any other communications between the Parties provided for under the terms of this Agreement shall be in writing (unless otherwise provided) and shall be served personally or by reputable next business day express courier service or by email transmission addressed to the relevant Party at the address stated below or at any other address notified by that Party to the other as its address for service. Any notice so given personally shall be deemed to have been served on delivery, any notice so given by express courier service shall be deemed to have been served the next business day after the same shall have been delivered to the relevant courier, and any notice so given by email

transmission shall be deemed to have been served on transmission and receipt of confirmation of successful transmission during normal business hours. As proof of such service it shall be sufficient to produce a receipt showing personal service, the receipt of a reputable courier company showing the correct address of the addressee or an activity report of the sender's network showing the confirmation of successful transmission.

Any notices to Buyer shall also be provided to Buyer's counsel or such notice shall not be deemed to be provided. Notices to Buyer's counsel shall be sent to the following address:

Prudentia Law Corporation
Attn: Gerald Lau
533 Airport Blvd Ste 400
Burlingame, CA 94010

28. **Severability.** If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Agreement.

If any provision or part-provision of this Agreement is invalid, illegal or unenforceable, the parties shall negotiate in good faith to amend such provision so that, as amended, it is legal, valid and enforceable, and, to the greatest extent possible, achieves the intended commercial result of the original provision.

29. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter. Each party acknowledges that in entering into this Agreement it does not rely on, and shall have no remedies in respect of, any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement. Each party agrees that it shall have no claim for innocent or negligent misrepresentation based on any statement in this Agreement.

30. **Assignment.** Neither party hereto shall assign, transfer, charge, sub-Agreement or deal in any other manner with all or any of its rights or obligations under the Agreement, except for the assignees, sublicensees, subcontractors, or subtenants of both Parties. Any assignment or sublease will not relinquish any Party from their duties, responsibilities, or liabilities in this agreement.

**Third Party Rights.** A person who is not a party to this Agreement has no right to enforce or to enjoy the benefit of any term of this Agreement and consequently no one other than a party to this Agreement, their successors and permitted assignees, shall have any right to enforce any of its terms.

31. **Waiver.** No failure or delay by a party to exercise any right or remedy provided under this Agreement or by law shall constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict the further exercise of that or any other right or remedy. No single or partial exercise of such right or remedy shall prevent or restrict the further exercise of that or any other right or remedy.

*33.* **Non-Disparagement.** Each Party agrees to take no action which is intended, or would reasonably be expected, to harm the other Party or its reputation or which would reasonably be expected to lead to unwanted or unfavorable publicity to the other Party. Such actions include disparaging remarks, comments or statements that impugn the character, honesty, integrity, morality or

9

business acumen or abilities in connection with any aspect of the operation of the other Party's business. These nondisparagement obligations extend to the other Party's affiliates and their respective shareholders, directors, officers, employees, representatives and agents.

**IN WITNESS WHEREOF** this Agreement has been executed by the parties.

**UPTIME ARMORY LLC**

Per: _____*R. D. Collazo*_____

    Name: Robert Collazo
    Title: CEO

I have authority to bind the corporation.

**CRYPTO INFINITI LLC**

Per: _____*Yi Lin*_____

    Name: Yi Lin
    Title: Director

I have authority to bind the corporation.

# SCHEDULE "A"

## DESCRIPTION OF EQUIPMENT, PURCHASE AND DELIVERY DETAILS

Description of Equipment:

Eight (8) substantially identical 40' Standard shipping containers, modified for use in Crypto Mining. Each container will be designed to hold and operate 280 S19 Antminers manufactured by Bitmain, or similar hardware, within 5% of specifications.

The major modifications include:

Structural: Long side louvers with additional vertical supports; entry door; framing for fans at door short end.

Interior: Rubber flooring; foamboard insulation; LED lighting; environment meters; two security cameras.

Racking: Four large industrial strength racks, each rack having 10 vertical shelves and fitting 7 miners per shelf. Each Pod5ive will be outfitted with 2 racks per side with a design that permits the miners' exhaust fans to be embedded in the foamboard insulation.

Networking: Shielded Cat 5e cabling from each miner to a Secondary network switch with one Secondary switch per rack. All Secondary switches will be aggregated via Cat 5e into an aggregator Primary switch. Customer will connect its own network into a router aggregator to the Primary switch. A server computer is provided using the Pod5ive monitoring software, or the customer's own software.

Airflow: 4 direct drive fans with 10 HP motors running on an independent Variable Frequency & Adjustable Speed Drive on a 60A 3P 415V breaker, each with a maximum of 29,500 cfm each. Intake air filtration and an evaporative cooler will process the incoming air.

Electrical: The Pod5ive will be delivered ready to accept 415V 3-phase electricity up to 2000A from a transformer. The Pod5ive will have 2 main breakers of 1000A each. Customer will provide electric service to the connection bar from the transformer to the block inside each main breaker.

Each Pod5ive will have 2 breaker panels feeding 30 smart power distribution units (3 per rack). Each PDU will have sufficient capacity to power 12 S19 miners at 240V and 12A. Networking equipment, evaporative cooler, security, server computer, sensors, and lights will be 120V circuit.

Deliver Location: 2000 Foster Mill Road, LaFayette, GA 30728
Deliver Date: Shall be shipped and installed on site prior to Oct.8 2021 to allow enough time for installation of Buyer's mining hardware.

NOTE: Purchase of Pod5ive containers does NOT include mining hardware, except as indicated above. The foregoing shall not be intended to include all features and modifications to create a Pod5ive. Additional specifications can be found in the attached brochure