**UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| Crypto Infiniti, LLC, | |
| Plaintiff, | C/A No. 7:24-cv-04911-TMC |
| v. | |
| Blockquarry Corp. f/k/a ISW Holdings, Inc., Pantheon Resources, Inc. and Hylmen, LLC, | **CRYPTO INFINITI, LLC'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS** |
| Defendants. | |

Crypto Infiniti, LLC (hereinafter "CI" or "Plaintiff") submits this Reply Memorandum in Support of its Motion to Dismiss Blockquarry's Counterclaims. Blockquarry (hereinafter "BQ") defends against the motion based primarily on *ipse dixit* arguments, to wit, that it alleged the requisite elements of claims for unjust enrichment, conversion, and trespass, and therefore the Court must accept those allegations for purposes of deciding this motion. Not so. Under the *Twombley* analysis, the Court must determine whether the relevant allegations are plausible. They are not.

<u>**LEGAL ARGUMENT**</u>

**I.     UNJUST ENRICHMENT/RESTITUTION**

As set forth in the Amended Complaint, CI contracted with Bit5ive for Bit5ive to provide bitcoin mining services to it, including the provision of electricity. CI had no direct dealings with BQ. In its Counterclaim, BQ states that it had no knowledge that CI was operating bitcoin miners on the property leased by BQ. (Answer and Countercl., at ¶ 143).

In its Memorandum in Support of the Motion to Dismiss, CI argued that in order to prove a claim for unjust enrichment, BQ must show that it conferred a non-gratuitous benefit on CI by showing that CI *induced* BQ to provide electricity to it. (CI's Mem., at 4-5, citing cases). Since CI

had no dealings with BQ, as a matter of law and logic CI did not induce BQ to do anything, much less to provide electricity to it.

BQ responds by doubling down that it properly alleged that its provision of electricity was non-gratuitous "because (1) Blockquarry has pled each element of a claim for unjust enrichment, (2) Blockquarry has adequately pled that the benefit conferred on Plaintiff was nongratuitous, and (3) Plaintiff's arguments improperly rely on the resolution of questions of fact." BQ, however, never closes the circle by pointing to any allegation in its counterclaim that fits the definition of "non-gratuitous" under the caselaw. Merely *alleging* that BQ's provision of electricity was "non-gratuitous" does not make it so. Indeed, such an allegation is implausible on its face because BQ does not allege that it ever had any dealings at all with CI.

In addition, CI paid Bit5ive for electricity for its bitcoin mining operations. (Am. Compl., at ¶ 17). What Bit5ive's arrangements were with BQ as to reimbursement for electricity charges is not a fact question that concerns CI. If somehow there was any benefit to CI in whatever that arrangement was between BQ and Bit5ive, such a benefit was incidental. Merely claiming that BQ reasonably relied on whoever used electricity on the site to reimburse it for that electricity does not make that reliance reasonable when the parties had no dealings with one another. These allegations therefore do not rise to the level of a plausible claim for unjust enrichment under *Niggel Assocs.* and progeny.

**II.     CONVERSION**

BQ has alleged that it and its clients provided bitcoin mining on the site, and that it engaged Bit5ive to manage its operations there. (BQ Answer and Countercl. to Am. Compl., at ¶¶ 140-142). As noted above, CI contracted with Bit5ive for bitcoin mining hosting services at this same site. CI paid all its invoices to Bit5ive, including payments for electricity. (Am. Compl., at ¶¶ 17, 22-23, and Exs. 1 and 3 to Am. Compl.). BQ paid Gaffney Board of Public Works for the electricity

used on the site. (Compl., at ¶¶ 33-35 in *Blockquarry Corp. v. Litchain Corp., et al.*, C/A No. 7:23-cv-01427-TMC (ECF No. 1)). BQ did not allege that the money it paid for electricity went to CI. In these circumstances, as CI never exercised any control over any of BQ's money, there is no set of facts that rises to the level of CI converting any money paid by BQ for electricity used on the site.

Once again, BQ's response simply realleges that CI converted its money and ignores the definition of conversion under South Carolina law. BQ paid Gaffney money for electricity. CI never saw that money, never had that money, and never touched that money. It therefore exercised no "unauthorized use or control" of that money. No amount of fact discovery changes this reality as set forth in the pleadings. Simply saying that BQ reasonably expected whoever used electricity to pay for it does not convert that expectation into the unauthorized use of money that CI never controlled. Merely restating these allegations does not make the legal theory plausible. The Court should therefore dismiss the counterclaim for conversion.

### III. TRESPASS

CI sent bitcoin miners to the site by agreement with Bit5ive, BQ's property manager for bitcoin mining. BQ acknowledged in its pleading that this "entry" onto the leased premises was "allowed" by Bit5ive. Thus, under the facts as pled, there was no "unauthorized" or "unwarranted" entry onto the land and hence no trespass. BQ counters that it did not provide Bit5ive authority to contract with third parties for bitcoin mining, that Bit5ive had no apparent authority, and hence CI's shipment of miners to the site by CI was an unauthorized entry onto land leased by BQ.

That argument, however, overstates what constitutes unauthorized or unwarranted entry. Rather, a third party may enter another's property by consent, whether such consent was actual, presumed, or implied. *See, e.g.*, *Groce v. Greenville, S & A. Ry. Co.*, 94 S.C. 199, 78 S.E. 888 (1913) (noting that consent to enter land may be "actual or presumed"); *In re IDC Clambakes,*

*Inc.*, 727 F.3d 58, 65 (1st Cir. 2013) ("Consent can be spoken or unspoken, express or implied, and there is no requirement that it be communicated to the actor. Apparent consent arises from the parties' conduct and from context.") (citations omitted); *Pruitt v. Wells Fargo Bank, N.A.*, 2015 WL 9490234 *6 (D. Md., Dec. 30, 2015).

Here, the pleadings demonstrate that BQ by its own actions of operating bitcoin mining on the site impliedly consented to third parties for the shipment of bitcoin miners to that site. BQ acknowledges that it operated bitcoin mining on the leased premises, and that Bit5ive was its property manager for these operations. (Answer to Am. Compl., at ¶¶ 141-142). That acknowledgment amounts to implied consent as a matter of law for CI to contract with Bit5ive to send bitcoin miners to the site for bitcoin mining. Even though BQ alleges that it did not specifically authorize Bit5ive to operate its own bitcoin mining, that is an issue between Bit5ive and BQ and is of no moment to CI, unless and until it was told by BQ to cease bitcoin operations. There is no allegation of any such communication. Therefore, BQ's trespass claim should be dismissed.

## CONCLUSION

For the reasons set forth above, CI respectfully requests the Court to dismiss the counterclaims against it.

*[Signature Page Follows]*

        Respectfully submitted,

        **WILLIAMS BURKE LLP**

        <u>/s/ Burl F. Williams</u>
        Burl F. Williams, (FED ID NO. 10556)
        201 Riverplace, Suite 501
        Greenville, South Carolina 29601
        (864) 546-5035
        burl@williamsburke.com

        Russell T. Burke (FED ID NO. 1604)
        1320 Main Street, Suite 300
        Meridian Building
        Columbia, South Carolina 29201
        (803) 724-1200
        russell@williamsburke.com

January 2, 2025        ***Counsel for Crypto Infiniti, LLC***